**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

|  |  |
|---|---|
| PARESA CHOWDHURY, LILY GENDUSO, JACQUELINE CLAY, and ASHLYNN HALE individually and on behalf of all others similarly situated,<br><br>                             Plaintiffs,<br><br>     v.<br><br>ABBOTT LABORATORIES,<br><br>                            Defendant. | Case No.<br><br><br><br>**JURY TRIAL DEMANDED** |

**<u>CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION ......................................................................................... 1

JURISDICTION AND VENUE ..................................................................................... 4

THE PARTIES ................................................................................................................ 4

I.      PLAINTIFF PARESA CHOWDHURY ............................................................. 4

II.     PLAINTIFF LILY GENDUSO ......................................................................... 5

III.    PLAINTIFF JACQUELINE CLAY .................................................................. 6

IV.   PLAINTIFF ASHYLNN HALE ....................................................................... 7

V.     DEFENDANT ABBOTT LABORATORIES ................................................... 8

FACTUAL ALLEGATIONS ........................................................................................ 9

I.      ADVERSE HEALTH CONDITIONS IN AMERICA CREATED A MARKET FOR SUGAR-FREE DRINK ALTERNATIVES .................................................. 9

II.     DEFENDANT MARKETS THE PRODUCTS AS HEALTH-CONSCIOUS ALTERNATIVES TO SUGARY DRINKS WHILE OMITTING THE DANGERS ASSOCIATED WITH THE PRODUCTS' INGREDIENTS, AND CHARGES A PRICE PREMIUM BASED ON THOSE REPRESENTATIONS AND OMISSIONS ...................................................................................................... 11

III.    SUCRALOSE—AND THE SUCRALOSE-6-ACETATE IT BREAKS DOWN INTO WHEN INGESTED—IS DANGEROUS TO HEALTH ............................. 14

        A.    The Dangers Associated With Sucralose ............................................. 14

        B.    The Dangers of Sucralose-6-Acetate .................................................... 17

IV.   PLAINTIFFS AND CLASS MEMBERS WERE INJURED BY DEFENDANT'S MISREPRESENTATIONS AND OMISSIONS ............................................... 18

CLASS ALLEGATIONS ............................................................................................ 21

CAUSES OF ACTION ................................................................................................ 23

        COUNT I ............................................................................................... 23

        COUNT II .............................................................................................. 26

COUNT III                                                28

COUNT IV                                                 31

COUNT V                                                  32

COUNT VI                                                 34

COUNT VII                                                35

PRAYER FOR RELIEF                                        39

JURY TRIAL DEMANDED                                      39

Plaintiffs Paresa Chowdhury, Lily Genduso, Jacqueline Clay, and Ashlynn Hale ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Abbott Laboratories ("Defendant"). Plaintiffs make the following allegations pursuant to the investigations of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiffs bring this class action lawsuit on behalf of themselves and all others similarly situated who purchased Pedialyte's electrolyte drinks and powders containing sucralose (the "Products").[1]

2. Defendant markets the Products to health-conscious consumers as safe and healthy hydration beverages and powders for children and adults. Indeed, Defendant represents that Pedialyte is the "#1 Brand Recommended by Doctors" and that the brand has been "backed by science since 1966."[2]

3. However, sucralose, the sugar alternative in the Products, has been shown to be genotoxic, cause and worsen diabetes and obesity, and increase the risk for cardiovascular diseases and cancer, among other harms. For instance, in May 2023, the World Health Organization advised against the consumption of sugar alternatives like sucralose, noting specifically the "increased risk of type 2 diabetes, cardiovascular diseases, and mortality in adults."[3]

---

[1] The Products include all Pedialyte Products with sucralose including: Advancedcare Plus liquid and powders, Sport liquid and powders, Advancedcare liquid and powders, Immune Support liquid and powders, Classic liquid and powder, Fast Hydration liquid and powder, and Electrolyte Drink Mix. Discovery may demonstrate that additional Pedialyte products are within the scope of this Demand. Accordingly, Plaintiffs reserve the right to include in their complaint additional products should the need arise.

[2] Pedialyte, https://www.pedialyte.com/home (last accessed Sept. 8, 2025).

4. Public service organizations, including the Center for Science in the Public Interest, likewise caution against the consumption of sucralose and identified it as a "high risk" ingredient due to studies linking sucralose to diabetes and blood cancers.[4]

5. Even worse, recent research suggests that sucralose metabolizes in the body into sucralose-6-acetate, a genotoxic compound.[5] This means that sucralose-6-acetate breaks up DNA and thereby increases the expression of genes associated with inflammation, oxidative stress, and cancer.[6]

6. However, Defendant's advertising and marketing tells consumers the opposite. Defendant markets the Products as healthy zero sugar hydration beverages and powders for health-conscious individuals. Defendant's marketing also implies that the Products are safe to consume, especially for adults and children when sick and/or dehydrated.[7] And Defendant does not disclose to consumers the harmful effects of sucralose, does not disclose that the sucralose in the Products always breaks down into sucralose-6-acetate, and does not disclose the harmful effects of sucralose-6-acetate.

7. Instead, Defendant markets and suggests the Products be used when children and adults are sick and dehydrated.[8] Thus, Defendant charges a price premium based on its

---

[3] *WHO Advises Not to Use Non-Sugar Sweeteners for Weight Control in Newly Released Guideline*, WHO (May 15, 2023), https://www.who.int/news/item/15-05-2023-who-advises-not-to-use-non-sugar-sweeteners-for-weight-control-in-newly-released-guideline.

[4] *Sucralose*, CTR. FOR SCI. IN THE PUB. INT. (last updated Jan. 4, 2021), https://www.cspinet.org/article/sucralose.

[5] Susan S. Schiffman, Elizabeth H. Scholl, Terrence S. Furey, and H. Troy Nagle, *Toxicological and pharmacokinetic properties of sucralose-6-acetate and its parent sucralose: in vitro screening assays,* J. OF TOXICOL. AND ENV. HEALTH, PART B 26:6, 309-10 (2023), https://www.tandfonline.com/doi/epdf/10.1080/10937404.2023.2213903?needAccess=true.

[6] *Id*. at 307.

[7] https://www.pedialyte.com/why-pedialyte

[8] *Id.*

representations of the Products as healthier zero sugar hydration beverages and powders and its omissions concerning sucralose's and sucralose-6-acetate's dangers.

8.      But, because Defendant includes sucralose in the Products' formula, the Products harm consumers by exposing them to sucralose-6-acetate and a host of adverse health effects that, among other things, are likely to increase the risk of obesity and cancer, as well as cause or worsen diabetes.  Defendant's representations and omissions are therefore material, false, and misleading.

9.      Further underscoring the harm of Defendant's misleading representations to unsuspecting consumers is the rising rate of diabetes and prediabetes in the United States, having reached 37.3 million and 26.4 million, respectively.[9]  This population depends on truthful labeling claims to make safe, informed choices to manage their health.  Defendant's decision to instead prey on them for profit while knowingly ignoring the well-documented science on sucralose is unconscionable and is in contravention of Illinois, California, New York and Massachusetts law and policy.

10.     Defendant engaged in unlawful business practices and has violated (i) the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/1, *et seq.*; (ii) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9); (ii) California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (iii) Massachusetts' Unfair and Deceptive Business Practices Act; (iv) Massachusetts' General Laws Chapter 93A *et seq.*; (v) New York Gen. Bus. Law ("GBL") § 349; and (vi) New York GBL § 350.

## JURISDICTION AND VENUE

---

[9] *Diabetes Statistics*, DIABETES RSCH. INST., https://diabetesresearch.org/diabetes-statistics/ (last accessed May 14, 2025).

11.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendant, and (4) there are more than 100 Class members.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

12.     This Court has personal jurisdiction over Defendant because it is an "unincorporated association" under CAFA, 28 U.S.C. § 1332(d), and Defendant is therefore "a citizen of the State where it has its principal place of business [Illinois] and the State under whose laws it is organized [Illinois]."  *See* 28 U.S.C. 1332(d)(10).

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted in this complaint occurred in this state and Defendant resides in this District.

## THE PARTIES

I.      **PLAINTIFF PARESA CHOWDHURY**

14.     Plaintiff Paresa Chowdhury is a citizen of Illinois who resides in Chicago, Illinois. Plaintiff Chowdhury has purchased the Products for four years.  Plaintiff Chowdhury's most recent purchase was in November 2023 when she purchased the Pedialyte Electrolyte Powder from Amazon while in Illinois.  Plaintiff Chowdhury purchased the Product for herself and younger siblings.

15.     Prior to her purchase, Plaintiff Chowdhury reviewed the images of the packaging and labeling, as well as Defendant's marketing of the Products, which represented the Products as health-conscious hydration beverages and powders, including Defendant's claim that its brand

7

is the "#1 doctor recommended brand for hydration." Nowhere on Defendant's packaging and in Defendant's marketing did Defendant disclose the dangers associated with sucralose in the Products, nor that the sucralose in the Products always breaks down into sucralose-6-acetate and the dangers associated with sucralose-6-acetate.

16.     Thus, Defendant represented to Plaintiff Chowdhury, and Plaintiff Chowdhury understood, that the Products were health-conscious zero sugar hydration beverages and powders. Further, Defendant did not disclose, and Plaintiff Chowdhury therefore did not know, that the Products were in fact harmful to health due to the presence of sucralose and the sucralose-6-acetate that it breaks down into when ingested.

17.     Defendant's misrepresentations and omissions were material to Plaintiff Chowdhury in that she would not have paid as much for the Products as she did had Defendant divulged the harmful health ramifications of sucralose and sucralose-6-acetate. Thus, Plaintiff Chowdhury was injured by the price premium she paid for the Products as a result of Defendant's misrepresentations and omissions.

## II.     PLAINTIFF LILY GENDUSO

18.     Plaintiff Lily Genduso is a citizen of Massachusetts who resides in Dorchester, Massachusetts. Plaintiff Genduso's most recent purchase was in January 2025 when she purchased the Pedialyte Fast Hydration Fruit Punch Powder Packets from Amazon while in Massachusetts. Plaintiff Genduso purchased the Product for her household.

19.     Prior to her purchase, Plaintiff Genduso reviewed the images of the packaging and labeling, as well as Defendant's marketing of the Products, which represented the Products as health-conscious zero sugar hydration beverages and powders, including Defendant's claim that its brand is the "#1 doctor recommended brand for hydration." Nowhere on Defendant's packaging and in Defendant's marketing did Defendant disclose the dangers associated with

sucralose in the Products, nor that the sucralose in the Products always breaks down into sucralose-6-acetate and the dangers associated with sucralose-6-acetate.

20.     Thus, Defendant represented to Plaintiff Genduso, and Plaintiff Genduso understood, that the Products were health-conscious zero sugar hydration beverages and powders.  Further, Defendant did not disclose, and Plaintiff Genduso therefore did not know, that the Products were in fact harmful to health due to the presence of sucralose and the sucralose-6-acetate that it breaks down into when ingested.

21.     Defendant's misrepresentations and omissions were material to Plaintiff Genduso in that she would not have paid as much for the Products as she did had Defendant divulged the harmful health ramifications of sucralose and sucralose-6-acetate.  Thus, Plaintiff Genduso was injured by the price premium she paid for the Products as a result of Defendant's misrepresentations and omissions.

### III.    PLAINTIFF JACQUELINE CLAY

22.     Plaintiff Jacqueline Clay is a citizen of New York who resides in New York, New York.  Plaintiff Clay's most recent purchase was in January 2024 when she purchased the Pedialyte AdvancedCare Plus Electrolyte Berry Frost Powder from Amazon while in New York.  Plaintiff Clay purchased the Product for her household.

23.     Prior to her purchase, Plaintiff Clay reviewed the images of the packaging and labeling, as well as Defendant's marketing of the Products, which represented the Products as health-conscious zero sugar hydration beverages and powders, including Defendant's claim that its brand is the "#1 doctor recommended brand for hydration."  Nowhere on Defendant's packaging and in Defendant's marketing did Defendant disclose the dangers associated with sucralose in the Products, nor that the sucralose in the Products always breaks down into sucralose-6-acetate and the dangers associated with sucralose-6-acetate.

24.     Thus, Defendant represented to Plaintiff Clay, and Plaintiff Clay understood, that the Products were health-conscious zero-sugar hydration beverages and powders.  Further, Defendant did not disclose, and Plaintiff Clay therefore did not know, that the Products were in fact harmful to health due to the presence of sucralose and the sucralose-6-acetate that it breaks down into when ingested.

25.     Defendant's misrepresentations and omissions were material to Plaintiff Clay in that she would not have paid as much for the Products as she did had Defendant divulged the harmful health ramifications of sucralose and sucralose-6-acetate.  Thus, Plaintiff Clay was injured by the price premium she paid for the Products as a result of Defendant's misrepresentations and omissions.

IV.     **PLAINTIFF ASHYLNN HALE**

26.     Plaintiff Ashylnn Hale is a citizen of California who resides in Winnetka, California.  Plaintiff Hale's most recent purchase was in April 2025 when she purchased the Pedialyte Electrolyte Water Drink Zero Sugar from a CVS while in California.  Plaintiff Hale purchased the Product for her household.

27.     Prior to her purchase, Plaintiff Hale reviewed the images of the packaging and labeling, as well as Defendant's marketing of the Products, which represented the Products as health-conscious zero sugar hydration beverages and powders, and that the Product provided "Immune Support."  Nowhere on Defendant's packaging and in Defendant's marketing did Defendant disclose the dangers associated with sucralose in the Products, nor that the sucralose in the Products always breaks down into sucralose-6-acetate and the dangers associated with sucralose-6-acetate.

28.     Thus, Defendant represented to Plaintiff Hale, and Plaintiff Hale understood, that the Products were health-conscious zero sugar hydration beverages and powders and that the

Electrolyte Water Drink Zero Sugar would support her immune system and not harm it. Further, Defendant did not disclose, and Plaintiff Hale therefore did not know, that the Products were in fact harmful to health due to the presence of sucralose and the sucralose-6-acetate that it breaks down into when ingested.

29.     Defendant's misrepresentations and omissions were material to Plaintiff Hale in that she would not have paid as much for the Products as she did had Defendant divulged the harmful health ramifications of sucralose and sucralose-6-acetate. Thus, Plaintiff Hale was injured by the price premium she paid for the Products as a result of Defendant's misrepresentations and omissions.

## V.     DEFENDANT ABBOTT LABORATORIES

30.     Defendant Abbott Laboratories is an Illinois Corporation with its principal place of business in Abbott Park, Illinois. Defendant Abbot Laboratories manufactures, markets, sells, and distributes the Products throughout the contiguous United States, including in Illinois, New York, California, and Massachusetts. Defendant Abbot Laboratories manufactured, marketed, and sold the Pedialyte Products at issue at all times during the relevant class period.

## FACTUAL ALLEGATIONS

## I.     ADVERSE HEALTH CONDITIONS IN AMERICA CREATED A MARKET FOR SUGAR-FREE DRINK ALTERNATIVES

31.     Roughly 37.3 million Americans, or 1 in 10 Americans, have diabetes.[10] Diabetes is characterized by high blood sugar caused by the inability to produce enough insulin—a hormone that allows sugar to be removed from the blood stream and used for energy in the cells of the pancreas.[11]

---

[10] *Diabetes Statistics*, *supra* note 9.

32.     The most common form of diabetes is Type 2 diabetes, which impairs the pancreas due to insulin resistance typically as a result of diet and lifestyle factors.[12]  Insulin resistance means that the cells in the pancreas stop responding to insulin, which normally triggers the flow of glucose into the cells.[13]

33.     When the cells become resistant, insulin is no longer able to signal glucose uptake, also known as the process in which the body absorbs sugar or glucose, so the glucose remains in the blood stream where it causes problems like organ failure and diabetes.[14]

34.     People with Type 2 diabetes may be prescribed medicine but generally manage the disease via exercise and healthy eating.  Accordingly, people with Type 2 diabetes seek out food products that are sugar-free, low in calories, and can help them manage their blood sugar.

35.     In addition, obesity in America has skyrocketed.  "Obesity is defined as having a body mass index (BMI) of 30.0 or higher.  Severe obesity is defined as having a BMI of 40.0 or higher."[15]  Between 2017 and 2020 "[t]he prevalence of obesity among U.S. adults aged 20 and over was 41.9%."[16]  This is an increase of over 10% from the pre-y2k obesity numbers.[17]

---

[11] *Diabetes Basics*, CDC, https://www.cdc.gov/diabetes/about/index.html (last accessed May 15, 2025).

[12] *Type 2 Diabetes*, CDC, https://www.cdc.gov/diabetes/about/about-type-2-diabetes.html (last accessed May 15, 2025).

[13] *About Insulin Resistance and Type 2 Diabetes*, CDC, https://www.cdc.gov/diabetes/about/insulin-resistance-type-2-diabetes.html (las accessed May 15, 2025).

[14] *Id.*

[15] *Adult Obesity Facts*, CDC, https://www.cdc.gov/obesity/adult-obesity-facts/index.html (last accessed May 16, 2025).

[16] *Id.*

[17] *Id.*

36.     Obesity has serious effects on a person's health.  Many obese individuals suffer from chronic diseases including high blood pressure and heart disease.[18]  Moreover, "23% of U.S. adults with obesity have diabetes."[19]

37.     With the rising rates of diabetes and obesity in the United States, artificial sweeteners, like sucralose, have become significantly more popular.  Sucralose was discovered in 1976 by chemists who were testing it for use as an insecticide.  Because of its sweet taste, its potential as a food additive was explored.

38.     Sucralose is synthesized from sucrose, *i.e.*, sugar, but is approximately 600 times sweeter than normal sugar.  Sucralose's defining characteristic is that it can provide sweetness with no calories.

39.     As such, both people with and without diabetes have begun to opt for sucralose because they mistakenly believe it to be a healthier alternative to sugar that will help regulate and maintain healthy blood sugar levels and aid in the management of metabolic conditions such as diabetes and obesity.

## VI.     DEFENDANT MARKETS THE PRODUCTS AS HEALTH-CONSCIOUS ALTERNATIVES TO SUGARY DRINKS WHILE OMITTING THE DANGERS ASSOCIATED WITH THE PRODUCTS' INGREDIENTS, AND CHARGES A PRICE PREMIUM BASED ON THOSE REPRESENTATIONS AND OMISSIONS

40.     Defendant capitalized on this rising popularity in sugar alternatives and created the Products to provide purported healthier zero sugar hydration beverages and powders to consumers.  Defendant further still capitalizes on consumers' lack of knowledge about sucralose and Defendant's claims that the Products are healthier zero-sugar hydration beverages and powders to charge consumers a price premium for its Products.  Defendant's use of sucralose is

---

[18] *Id.*

[19] *Id.*

all the more alarming given that Defendant's brand is marketed to parents of sick and dehydrated children and holds itself out as being the "#1 brand recommended by pediatricians, doctors, and pharmacists." In this way, Defendant tells consumers that they can trust it, especially to give Defendant's Products to their children when they are sick because the brand is "backed by science" and has been "since 1966."[20] Yet, because Defendant is "science backed," it knew or should have known of the genotoxic effects of when sucralose breaks down into sucralose-6-acetate and how these effects are even more deleterious for children's small and growing bodies.

41. Defendant formulates, manufactures, markets, and sells the Products under the brand name Pedialyte in its online store, www.pedialyte.com, in brick-and-mortar stores, such as CVS, and other online websites, such as Amazon.com.

42. Though Defendant's Products come in a variety of flavors, the Products are all substantially similar in that they:

     (a)     are all manufactured by Defendant;

     (b)     are all sold under the brand name, Pedialyte;

     (c)     are all drinkable;

     (d)     all contain sucralose;

     (e)     are all labeled, marketed, and advertised with the Health Claims for the health-conscious individual seeking a healthier zero sugar hydration beverage or powder when sick or dehydrated;

     (f)     are all similarly packaged using similar styles for images and written content; and

     (g)     are all marketed to mislead and induce consumers to overpay a premium, or otherwise purchase a Product, which claims to be for the health-conscious individual, despite the inclusion of sucralose that causes a host of adverse health effects, that they would not have purchased.

---

[20] Pedialyte, https://www.pedialyte.com/home (last accessed Sept. 8, 2025).

43. The Products are advertised as being "zero sugar hydration" and as healthy sugar-free hydration beverages and powders that are safe to consume when dehydrated or sick for health-conscious individuals.

44. For instance, on Defendant's website, the Product page for the Pedialyte Electrolyte Drink Mix with Zero Sugar contains the following description of the Product: "Pedialyte Electrolyte Drink Mix has zero sugar* and hydrates with 3 key electrolytes: sodium, chloride, and potassium."[21] Zero Sugar is listed with an asterisk to alert the consumer that the Product is "[l]ow in calories." Similarly, in the marketing photos on the Amazon.com website for the Products, the Products are presented as "only 5 calories per serving."[22] On the Product, the hydration qualities of the beverage are emphasized by stating that the Product provides "Hydration with Key Electrolytes" and is safe for consumption when sick because it contains "Zinc and Magnesium for Immune Support." These representations tell consumers that the Products will support their immune systems by providing them with essential vitamins and minerals. Consumers rely on Defendant's representations and expect the Products to at least not harm their immune system, if not support it. However, because Defendant uses sucralose in its Products, the "immune support" representation is directly at odds with the harm that sucralose, which breaks down into surcarlose-6-acetate, causes the body.

45. In addition, on Defendant's website, the Product page for the Fast Hydration Powder Packs states that the Product: "[h]as 2x the electrolytes and ½ the sugar of the leading sports drink" and is "[s]cientifically designed to work better than water for hydration."[23] On the

---

[21] *Pedialyte Electrolyte Drink Mix*, Pedialyte, https://www.pedialyte.com/products/electrolyte-drink-mix/berry-frost (last accessed Sept. 3, 2025).

[22] *Pedialyte Electrolyte Drink Mix, Zero Sugar*, Amazon, https://tinyurl.com/3k732rhd (last accessed Sept. 3, 2025).

Product itself, Defendant emphasizes that the Product is "Great for Kids & Adults." Defendant's emphasis on the science behind its Products reinforces for consumers that it is an authority on the health-related representations it makes on its Products. Defendant capitalizes on this ostensible authority to sell Products that purport to promote consumers' health, all while omitting that the Products have harmful effects because they contain sucralose, which breaks down into sucralose-6-acetate and is genotoxic.

46.     Nowhere on Defendant's packaging, labeling, or Website does Defendant warn consumers about the dangers associated with sucralose or sucralose-6-acetate, described below. Because Defendant represents its Products as "backed by science" and as the "#1 brand recommended by doctors,"[24] Defendant has or should have knowledge of the dangers of sucralose, yet Defendant omits this material fact from consumers.

47.     In short, Defendant has positioned its Products as healthier zero sugar hydration beverages and powders. And Defendant charges a price premium to consumers based on their representations and omissions positioning their Products as health-conscious zero sugar hydration beverages and powders.

48.     As discussed below, Defendant's positioning of its Products is false because they contain sucralose, which always breaks down into sucralose-6-acetate. Both are associated with significant health issues. Thus, consumers are paying more for the Products than they otherwise would as a result of Defendant's representations and omissions.

## VII.    SUCRALOSE—AND THE SUCRALOSE-6-ACETATE IT BREAKS DOWN INTO WHEN INGESTED—IS DANGEROUS TO HEALTH

---

[23] *Pedialyte Fast Hydration Powder Packs*, Pedialyte, https://www.pedialyte.com/products/fast-hydration-powder-packs/grape (last accessed Sept. 3, 2025).

[24] Pedialyte, https://www.pedialyte.com/home (last accessed Sept. 3, 2025).

49.    "[D]espite the reassuring claims surrounding artificially sweetened products, there is growing evidence that the consumption of [artificially-sweetened beverages] may not be totally healthy for humans."[25]

### A.    The Dangers Associated With Sucralose

50.    Each of the Products contains sucralose as an ingredient, which has been shown to induce and worsen metabolic syndrome, obesity, and Type 2 diabetes by interfering with bodily responses responsible for controlling glucose and energy homeostasis.[26]

51.    For instance, the ingestion of sucralose causes blood sugar destabilization by triggering an abnormally high reaction to glucose, causing it to irrationally spike after consuming an otherwise normal meal.[27]

52.    Moreover, studies indicate sucralose consumption can lead to increased glucose and insulin levels, directly the opposite of what diabetics and those seeking sugar-free drinks need.[28]

53.    Likewise, sucralose has been shown to induce and worsen metabolic syndrome, obesity, and Type 2 diabetes.[29]   A recent study of 105,588 participants conducted in July 2023 found that as compared to non-consumers of sucralose, those who consume sucralose had a

---

[25] Cristina Diaz et al., *Artificially Sweetened Beverages and Health Outcomes: An Umbrella Review*, 14(4) ADVANCES IN NUTRITION 710, 710 (July 2023), https://www.sciencedirect.com/science/article/pii/S2161831323003150?via%3Dihub.

[26] M. Yanina Pepino, *Metabolic Effects of Non-Nutritive Sweeteners*, 152 PHYSIOLOGY AND BEHAVIOR 450, 450 (Dec. 1, 2015), https://www.sciencedirect.com/science/article/pii/S0031938415003728#bb0215.

[27] M. Yanina Pepino et al., *Sucralose Affects Glycemic and Hormonal Responses to an Oral Glucose Load*, 36(9) DIABETES CARE 2530, 2530-34 (Apr. 30, 2013), https://pubmed.ncbi.nlm.nih.gov/23633524/.

[28] Pepino, note 26; *see also* Pepino et al., *supra* note 27.

[29] Pepino, *supra* note 26.

higher risk of developing adverse conditions related to glucose metabolism, including insulin resistance syndrome, a precondition to Type 2 diabetes.[30]

54.     Similarly, a May 2023 study found that consumption of artificially sweetened beverages, which include beverages sweetened by sucralose, is associated with a higher risk of obesity, Type 2 diabetes, hypertension, cardiovascular disease incidence, and all-cause mortality.[31]

55.     Sucralose has also been found to decrease insulin sensitivity, thereby causing the body to be more resistant to insulin, and to absorb more sugar from the bloodstream.[32]  This can cause an at-risk pancreas, like in someone who is prediabetic or already has diabetes, to work even harder, pumping more and more insulin resulting in the cells becoming more resistant.[33]  Over time, the pancreas can shut down and the cells no longer respond to insulin (*i.e.*, insulin resistance), which can cause high blood sugar and diabetes.[34]

56.     Moreover, insulin resistance caused by sucralose also can impact individuals with no pre-existing health conditions.  A 2018 study tested sucralose consumption at the 15% Acceptable Daily Intake (ADI) in healthy participants and found a significant decrease in insulin sensitivity.[35]

---

[30] Charlotte Debras et al., *Artificial Sweeteners and Risk of Type 2 Diabetes in the Prospective NutriNet-Sante Cohort*, 46(9) DIABETES CARE 1681, 1681 (July 25, 2023), https://pubmed.ncbi.nlm.nih.gov/37490630/.

[31] Diaz et al., *supra* note 25.

[32] Yanina M. Pepino, *The Not-So Sweet Effects of Sucralose on Blood Sugar Control*, 108(3) THE AM. J. OF CLINICAL NUTRITION 431, 431-432 (Sept. 2018), https://www.sciencedirect.com/science/article/pii/S0002916522029665?via%3Dihub.

[33] Kushagra Mathur et al., *Effect of Artificial Sweeteners on Insulin Resistance Among Type-2 Diabetes Mellitus Patients*, 9 J. FAM. MED. PRIM. CARE 69, 69 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7014832/.

[34] *Type 2 Diabetes*, *supra* note 12.

57.     Similarly, a study from 2017 found that after only two weeks of daily sucralose intake, the body's blood glucose response to external glucose was negatively affected, thereby detrimentally impacting glycemic control, and causing an otherwise healthy adult to be predisposed to diabetes.[36]

58.     Other studies have shown that even consuming a small dose of sucralose increased the amount of insulin in the blood to an unhealthy level (known as hyperinsulinemia) in otherwise healthy participants.[37]

59.     In addition, sucralose causes harm to the gut microbiome by causing gut dysbiosis (an imbalance between the good and bad bacteria in the gut) and gut inflammation.[38] These impacts on the gut can worsen insulin resistance, promote obesity, and increase sugar cravings.[39] What's worse, this increase in sugar cravings can lead to overconsumption of food, thereby causing weight gain and obesity.[40]

---

[35] Alonso Romo-Romo et al., *Sucralose Decrease Insulin Sensitivity in Healthy Subjects: A Randomized Controlled Trial*, 108 AM. J. OF CLINICAL NUTRITION485, 485 (Sept. 1, 2018), https://pubmed.ncbi.nlm.nih.gov/30535090/.

[36] Richard Young et al., *Impact of Artificial Sweeteners on Glycaemic Control in Healthy Humans*, EUR. ASS'N FOR THE STUDY OF DIABETES, (Sept. 14, 2017), https://www.easd.org/media-centre/home.html#!resources/impact-of-artificial-sweeteners-on-glycaemic-control-in-healthy-humans

[37] Angelica Y. Gomez-Arauz et al., *A Single 48mg Sucralose Sip Unbalances Monocyte Subpopulations and Stimulates Insulin Secretion in Healthy Young Adults*, J. IMMUNOL RSCH. (Apr. 28, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6512026/.

[38] Susan S. Schiffman & Kristina I. Rother, *Sucralose, A Synthetic Organochlorine Sweetener: Overview of Biological Issues*, 16 J. OF TOXICOLOGY AND ENV'T HEALTH 399, 399 (Nov. 12, 2013), https://www.tandfonline.com/doi/pdf/10.1080/10937404.2013.842523?noFrame=true.

[39] Clare J. Lee et al., *Gut Microbiome and Its Role in Obesity and Insulin Resistance*, 1461(1) ANNALS OF THE N.Y. ACAD. OF SCI. 37, 37 (May 14, 2019), https://pubmed.ncbi.nlm.nih.gov/31087391/.

[40] Qing Yang, *Gain Weight by "Going Diet?" Artificial Sweeteners and the Neurobiology of Sugar Cravings*, 83 YALE J. OF BIOLOGY AND MED. 101, 101 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892765/; Qiao-Ping Wang, et al., *Sucralose*

60.     In sum, the presence of sucralose in the Products renders them immensely harmful to consumers despite their health-conscious positioning, and without any warnings of the same. This is especially true because the Products are marketed and sold for frequent use and even daily consumption.

## B.     The Dangers of Sucralose-6-Acetate

61.     Further compounding the harms caused by the Products is that the sucralose in the Products is always metabolized into sucralose-6-acetate in the intestines.[41]   And sucralose-6-acetate is even more harmful than sucralose itself.

62.     Studies have found that sucralose-6-acetate is genotoxic, meaning it breaks up DNA strands, causing irreparable damage to a person's DNA.[42]   A single sucralose-sweetened drink might have enough of this impurity from the manufacturing process to far exceed the safe daily amount of consumption.[43]

63.     Further, intestines exposed to sucralose-6-acetate showed increased activity in genes associated with inflammation, oxidative stress, and cancer risk.[44]

64.     Indeed, a 2020 study conducted on mice that consumed 1.5 mg of sucralose in water, just like how some of the Products are used, over the course of 6-weeks found that sucralose caused an increase in the number and size of cancerous colon tumors.[45]

---

*Promotes Food Intake Through NPY and a Neuronal Fasting Response*, 24 CELL METABOLISM 75, 75 (2016), https://www.cell.com/cell-metabolism/comments/S1550-4131(16)30296-0#secsectitle0010.

[41] Susan S. Schiffman, Elizabeth H. Scholl, Terrence S. Furey, and H. Troy Nagle, *Toxicological and Pharmacokinetic Properties of Sucralose-6-acetate and its Parent Sucralose: in vitro screening assays,* 26(6) J. OF TOXICOLOGY AND ENV. HEALTH 307, 307 (2023), https://www.tandfonline.com/doi/epdf/10.1080/10937404.2023.2213903?needAccess=true.

[42] *Id.*

[43] *Id.*

[44] *Id.*

65.     Thus, although the Products may not contain sucralose-6-acetate, a person is still always exposed to sucralose-6-acetate and its harmful effects because, by virtue of containing sucralose, the body still will produce sucralose-6-acetate when sucralose is ingested.  This too rebuts Defendant's health-conscious claims and positioning and is a material omission from the Products' packaging.

## VIII.   PLAINTIFFS AND CLASS MEMBERS WERE INJURED BY DEFENDANT'S MISREPRESENTATIONS AND OMISSIONS

66.     To summarize the preceding allegations, Defendant has capitalized on the need for sugar-free alternatives by manufacturing and selling the Products, which contain sucralose instead of sugar.  Defendant positions the Products as health-conscious hydration beverages and powders and charges a price premium based on those representations.  Finally, Defendant does not disclose that sucralose is always metabolized into sucralose-6-acetate once ingested, does not disclose the harmful effects associated with either compound, and charges a price premium based on those omissions as well.

67.     However, multiple studies have found sucralose is harmful and not a health-conscious alternative to sugar.  Even worse, sucralose always breaks down into sucralose-6-acetate when consumed, and sucralose-6-acetate is even more harmful to consumers than the sucralose it comes from.  Defendant's representations and material omissions are thus false and misleading.

68.     Defendant, as a manufacturer or party to a contract to manufacture, thereby providing and approving the Products' designs, and formulas, and as the seller and advertiser of the Products, is best situated to set the price of the Products and to know the content of the

---

[45] Xueting Li et al., *Sucralose Promotes Colitis-Associated Colorectal Cancer Risk in a Murine Model Along with Changes in Microbiota*, 10 FRONTIERS IN ONCOLOGY, June 2020, at 1, https://www.frontiersin.org/journals/oncology/articles/10.3389/fonc.2020.00710/full.

Products. Defendant knew or should have known the harmful effects of sucralose when consumed, including that it breaks down into sucralose-6-acetate, which is genotoxic. Nonetheless, Defendant decided to charge a price premium for the Products by concealing and affirmatively misrepresenting the true nature of the Products, as discussed herein.

69. Defendant knew, or should have known, that its claims were false, misleading, deceptive, and unlawful at the time that Defendant manufactured, marketed, advertised, labeled, and sold the Products to Plaintiffs and the Class. Defendant intentionally and deliberately used the Health Claims to cause Plaintiffs and similarly situated consumers to purchase the Products and pay a price premium for them. Defendant, as the manufacturer, had exclusive control over how the Products were formulated, marketed and labeled, and priced, and Defendant readily and easily could have remedied the deception by not positioning the Products as health-conscious alternatives by disclosing the dangers of sucralose and sucralose-6-acetate and by not charging a premium for the Products. Instead, Defendant deliberately chose to market the Products as safe and healthier hydration beverages and powders for health-conscious individuals, thereby misleading and inducing consumers into buying and overpaying for the Products. Thus, Defendant knew, or should have known, at all relevant times, that its representations and omissions misled reasonable consumers, such as Plaintiffs, into buying the Products and paying more than they otherwise would have, had they known the truth about the Products.

70. Defendant's representations and omissions are material to reasonable consumers, including Plaintiffs, because consumers seek healthier alternatives for foods and ingredients that will allow them to specifically seek healthier alternatives to sugar. Consequently, Defendant's representations and omissions have the potential to influence consumers' decision to not only purchase the Products, but pay a price premium for them, including Plaintiffs, as set forth herein.

Indeed, Plaintiffs did rely on Defendant's representations and omissions that the Products were safe and healthier hydration beverages and powders.

71.     Plaintiffs and Class Members were injured by Defendant's practices in that, had Defendant not falsely positioned the Products as healthier hydration beverages and powders, Plaintiffs would not have paid as much for the Products as they did or would not have purchased them at all.

72.     Likewise, Plaintiffs and Class Members were injured by Defendant's practices in that, had Defendant disclosed that the sucralose in the Products breaks down into sucralose-6-acetate and had Defendant disclosed the harmful effects of sucralose and sucralose-6-acetate, Plaintiffs and Class Members would not have paid as much for the Products as they did or would not have purchased them at all.

73.     Accordingly, Plaintiffs and Class Members were injured by the price premium they paid for the Products as a result of Defendant's misrepresentation and material omissions.

## CLASS ALLEGATIONS

74.     ***Illinois Class***. Plaintiff Chowdhury brings this Illinois Class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), individually and on behalf of a class defined as:

> All persons in the state of Illinois who purchased the Products during the statute of limitations period.

75.     ***California Class***. Plaintiff Hale brings this California Class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), individually and on behalf of a class defined as:

> All persons in the state of California who purchased the Products during the statute of limitations period.

76.     ***Massachusetts Class***. Plaintiff Genduso brings this Massachusetts Class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), individually and on behalf of a class defined as:

> All persons in the state of Massachusetts who purchased the Products during the statute of limitations period.

77.     ***New York Class***. Plaintiff Clay brings this New York Class action pursuant to

Fed. R. Civ. P. 23(a) and 23(b)(3), individually and on behalf of a class defined as:

> All persons in the state of New York who purchased the Products
> during the statute of limitations period.

78.     Excluded from the Classes are: (1) persons who made such purchases for the

purpose of resale; (2) any Judge or Magistrate presiding over this action and any members of

their families; (3) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and

any entity in which Defendant or its parents have a controlling interest and its current or former

employees, officers, and directors;(4) Plaintiffs' counsel; and (5) Defense counsel.

79.     Unless otherwise specified, "Classes" shall refer to Classes collectively.

80.     ***Numerosity.***  At this time, Plaintiffs do not know the exact number of members of

the aforementioned Classes.  However, given the size of Defendant's business, Plaintiffs believe

that Class Members are so numerous that joinder of all members is impracticable.

81.     There is a well-defined community of interest in the questions of law and facts

involved in this case.   Questions of law and fact common to members of the Classes that

predominate over questions that may affect individual Class Members include:

> (a)     Whether the presence of sucralose and sucralose-6-acetate
>         in the Products renders them harmful to health;
>
> (b)     Whether Defendant misrepresented and/or failed to disclose
>         material facts concerning the Products; and
>
> (c)     Whether Plaintiffs and the Classes sustained damages, and
>         if so, the proper measure of those damages.

82.     ***Typicality.***  The claims of the named Plaintiffs are typical of the claims of the

Classes because the named Plaintiffs, like other members of the Classes, purchased the Products

relying on the representations and omissions made by Defendant and were exposed to the same

packaging and labeling as all other Class Members, and paid a price premium because of Defendant's misrepresentations and omissions.

83.     ***Adequate Representation.***  Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

84.     ***Superiority.***  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the members of the Classes.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## CAUSES OF ACTION

### COUNT I
**Violations Of The Illinois Consumer Fraud And Deceptive Trade Practices Act,
815 ILCS 505/1, *et seq.*
(On behalf of Plaintiff Chowdhury and the Illinois Class)**

85.     Plaintiff Chowdhury repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86. Plaintiff Chowdhury brings this Count on behalf of herself and the Illinois Class against Defendant.

87. Plaintiff Chowdhury and other Illinois Class Members are persons within the context of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1(c).

88. Defendant is a person within the context of the ICFA, 815 ILCS 505/1(c).

89. At all times relevant hereto, Defendant was engaged in trade or commerce as defined under the ICFA, 815 ILCS 505/1(f).

90. Plaintiff Chowdhury and the proposed Illinois Class are "consumers" who purchased the Products for personal, family or household use within the meaning of the ICFA, 815 ILCS 505/1(e).

91. The ICFA does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer of this State or the United States." 815 ILCS 505/10b(1).

92. The ICFA prohibits engaging in any "unfair or deceptive acts or practices … in the conduct of any trade or commerce." ICFA, 815 ILCS 505/2.

93. The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"). 815 ILCS § 505/2.

94. Plaintiff Chowdhury and the other Illinois Class Members reasonably relied upon Defendant's representation that the Products were safe for personal use and, due to Defendant's

misrepresentation of the safety of sucralose in the Products, Plaintiff Chowdhury read and relied on Defendant's labeling to conclude that the Products were safe to consume when sick and/or dehydrated.

95.     Defendant's conduct, as described herein, took place within the State of Illinois and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, *et seq.*

96.     Defendant violated the ICFA by representing that the Products have characteristics or benefits that they do not have.  815 ILCS § 505/2; 815 ILCS § 510/2(7).

97.     Defendant advertised the Products with intent not to sell them as advertised, in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(9).

98.     Defendant engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of 815 ILCS § 505/2; 815 ILCS § 510/2(3).

99.     Prior to placing the Products into the stream of commerce and into the hands of consumers, Defendant knew or should have known that the Products' sucralose was not as safe to consume as Defendant warranted, but Defendant further misrepresented, omitted, and concealed this fact to consumers, including Plaintiff Chowdhury and Illinois Class members, by not including on the Products' labels or otherwise warning to consumers about the detrimental health effects of sucralose.

100.    Defendant intended that Plaintiff Chowdhury and each of the other Illinois Class Members would reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the true nature of the Products.

101. Given Defendant's position in the health market as an industry leader, Plaintiff Chowdhury and reasonable consumers, trusted and relied on Defendant's representations and omissions regarding the safety of sucralose in the Products.

102. Defendant's misrepresentations, concealment, omissions and other deceptive conduct was likely to deceive and cause misunderstanding and/or in fact caused Plaintiff Chowdhury and each of the other Illinois Class Members to be deceived about the true nature of the Products.

103. Plaintiff Chowdhury and Illinois Class Members have been injured as a proximate result of Defendant's violations of the ICFA and have suffered damages as a direct and proximate result of purchasing the Products.

104. As a direct and proximate result of Defendant's violations of the ICFA, as set forth above, Plaintiff Chowdhury and the Illinois Class Members have suffered ascertainable losses of money caused by Defendant's misrepresentations and material omissions regarding the safety of sucralose in the Products.

105. Had they been aware of the true nature of the Products, Plaintiff Chowdhury and Illinois Class Members either would have paid less for the Products or would not have purchased them at all.

106. On or about May 5, 2025, Plaintiff Chowdhury provided written notice to Defendant of its violations of the ICFA described herein, but Defendant did not remedy its breaches. Therefore, within 30 days of receiving notice, Defendant did not take the necessary steps outlined in Plaintiff Chowdhury's notice letter to remedy its breach of the ICFA described herein.

107. Based on Defendant's unfair and/or deceptive acts or practices, Plaintiff Chowdhury and the Illinois Class Members are therefore entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs and attorneys' fees, under 815 ILCS 505/10a.

## **COUNT II**
**Violation Of California's Consumers Legal Remedies Act ("CLRA")**
**California Civil Code §§ 1750, *et seq.***
**(On Behalf of Plaintiff Hale and California Class)**

108. Plaintiff Hale incorporates the foregoing allegations as if fully set forth herein.

109. Plaintiff Hale brings this claim individually and on behalf of herself and the California Class against Defendant.

110. Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…"

111. Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that the goods are of a particular style or model, if they are of another."

112. Civil Code § 1770(a)(9) prohibits "advertising goods … with the intent not to sell them as advertised."

113. Defendant violated Civil Code §§ 1770(a)(5), (a)(7), and (a)(9) by holding out the Products as safe for consumption for children and adults when they contain sucralose, a genotoxic sugar alternative.  Sucralose is known to cause and worsen diabetes and obesity, and increase the risk for cardiovascular diseases and cancer, among other harms.

114. Defendant has exclusive knowledge and/or superior knowledge of the contents of the Products as it is responsible for manufacturing, marketing, selling, and distributing the Products, which was not known to Plaintiff Hale or the California Class.

115.    Defendant made material misrepresentations about the Products to Plaintiff Hale and the Members of the California Class while suppressing the true nature of the Products. Specifically, by warranting that the Products are safe for consumption as health-conscious hydration beverages and powders suitable for adults and children when sick or dehydrated, when they actually contain sucralose, which metabolizes in the body into sucralose-6-acetate, a genotoxic compound.[46]  Sucralose is known to cause and worsen diabetes and obesity, and increase the risk for cardiovascular diseases and cancer, among other harms.

116.    Plaintiff Hale and the California Class have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid.

117.    On or about April 29, 2025, prior to the filing of this complaint, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all material respects with California Civil Code § 1782(a).  The letter advised Defendant that it was in violation of the CLRA with respect to the presence of sucralose in the Products and demanded that Defendant cease and desist from such violations and make full restitution by refunding the monies received therefrom to consumers.  The letter stated that it was sent on behalf of all other similarly situated purchasers.

118.    Defendant failed to remedy the issues raised by the notice letter.

119.    Pursuant to Civ. Code § 1780, Plaintiff Hale and the California Class seek: (a) actual damages in an amount to be determined at trial; (b) an order enjoining Defendant from continuing its violative acts and practices; (c) restitution of all money and property lost by

---

[46] Susan S. Schiffman, Elizabeth H. Scholl, Terrence S. Furey, and H. Troy Nagle, *Toxicological and pharmacokinetic properties of sucralose-6-acetate and its parent sucralose: in vitro screening assays,* J. OF TOXICOL. AND ENV. HEALTH, PART B 26:6, 309-10 (2023), https://www.tandfonline.com/doi/epdf/10.1080/10937404.2023.2213903?needAccess=true.

Plaintiff Hale and Members of the California Class as a result of Defendant's unlawful conduct; (d) punitive damages; (e) any other relief that the Court deems proper; and (f) attorneys' costs and fees.

**COUNT III**
**Violation Of California's Unfair Competition Law ("UCL")**
**California Civil Code §§ 17200, *et seq*.**
**(On Behalf of Plaintiff Hale and California Class)**

120.     Plaintiff Hale incorporates the foregoing allegations as if fully set forth herein.

121.     Plaintiff Hale brings this claim individually and on behalf of the California Class against Defendant.

122.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

123.     Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** by misbranding its Products pursuant to 21 U.S.C. § 343, by advertising that the Products were safe for consumption as healthier hydration beverages and powders suitable for adults and children when sick or dehydrated, when they actually contain sucralose, which metabolizes in the body into sucralose-6-acetate, a genotoxic compound.  Sucralose is known to cause and worsen diabetes and obesity, and increase the risk for cardiovascular diseases and cancer, among other harms.

124.     Finally, Defendant engaged in unlawful business practices by violating the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/1, *et seq.*; CLRA, Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9); California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.; Massachusetts Unfair and Deceptive Business Practices Act

Massachusetts General Laws Chapter 93A *et seq.*;New York Gen. Bus. Law § 349, and New York Gen. Bus. Law § 350.

125.    In addition, as described more fully above, Defendant's misleading marketing, advertising, packaging, and labeling of its Products is likely to deceive reasonable consumers.

126.    Defendant also violated the UCL's prohibition against engaging in **Unfair Business Practices.**    Defendant's acts, omissions, misrepresentations, practices, and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Bus. & Prof. Code §§ 17200, *et seq.*, as the conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

127.    There were reasonably available alternatives to further Defendant's legitimate business interest, other than the conduct described above.

128.    Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices.**  Defendant's claims, nondisclosures, and misleading statements with respect to the Products, as more fully set forth above, were false, misleading, and/or likely to deceive the consuming public within the meaning of Bus. & Prof. Code § 17200.

129.    Plaintiff Hale and the Members of the California Class suffered a substantial injury by virtue of buying Defendant's Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the risk factors of consuming sucralose in the Products.

130.    There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Products.

32

131. Plaintiff Hale and the Members of the California Class had no way of reasonably knowing that the Products they purchased were not marketed, advertised, packaged, or labeled in conformity with Defendant's representations. Thus, they could not have reasonably avoided the injury each of them suffered.

132. The gravity of the consequences of Defendant's conduct, as described above, outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives that exist in the marketplace. Such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff Hale and the other Members of the California Class. _

133. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff Hale and the California Class seek an order of this Court that includes, but is not limited to, requiring Defendant to (a) provide restitution to Plaintiff Hale and the other California Class Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff Hale's attorneys' fees and costs.

**COUNT IV**
**Violation Of California's False Advertising Law ("FAL")**
**California Business & Professions Code §§ 17500,** *et seq.*
**(On Behalf of Plaintiff Hale and California Class)**

134. Plaintiff Hale incorporates the foregoing allegations as if fully set forth herein.

135. Plaintiff Hale brings this claim individually and on behalf of herself and the California Class against Defendant.

136. Defendant's acts and practices, as described herein, have deceived and are likely to continue to deceive members of the California Class and the public. As described throughout this Complaint, Defendant misrepresented the Products as safe for consumption as healthy zero sugar hydration beverages and powders suitable for adults and children when sick or dehydrated,

when they actually contain sucralose, which metabolizes in the body into sucralose-6-acetate, a genotoxic compound. Sucralose is known to cause and worsen diabetes and obesity, and increase the risk for cardiovascular diseases and cancer, among other harms.

137. By its actions, Defendant disseminated uniform advertising regarding the Products to and across California. The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code §§ 17500, *et seq.* Such advertisements were intended to and likely did deceive the consuming public.

138. The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the Products contain sucralose.

139. Defendant continues to misrepresent to consumers that the Products are "Great for Adults and Children" when in reality they contain sucralose, which metabolizes in the body into a genotoxic compound. Sucralose is known to cause and worsen diabetes and obesity, and increase the risk for cardiovascular diseases and cancer, among other harms.

140. In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law. Plaintiff Hale and the Members of the California Class based their purchasing decisions on Defendant's omitted material facts. The revenue attributable to the Products sold in those false and misleading advertisements likely amounts to millions of dollars. Plaintiff Hale and the Members of the California Class were injured in fact and lost money and property as a result.

141. The misrepresentation and non-disclosures by Defendant and the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.*

142.     As a result of Defendant's wrongful conduct, Plaintiff Hale and the Members of the California Class lost money in an amount to be proven at trial.  Plaintiff Hale and the Members of the California Class are therefore entitled to restitution as appropriate for this cause of action.

143.     Plaintiff Hale and the California Class therefore seek (a) all monetary and non-monetary restitution allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; (b) declaratory relief; (c) reasonable attorneys' fees and costs under California Code Civ. Proc. 1021.5; (d) injunctive relief, and other appropriate equitable relief.

## COUNT V
### Violation Of New York General Business Law § 349
### (On Behalf of Plaintiff Clay and the New York Class)

144.     Plaintiff Clay incorporates the forgoing allegations as if fully set forth herein.

145.     The acts of Defendant, as described above, constitute unlawful, deceptive, and fraudulent business acts and practice.

146.     Defendant markets the Products as safe for consumption as healthy zero sugar hydration beverages and powders suitable for adults and children when sick or dehydrated, when they actually contain sucralose, which metabolizes in the body into sucralose-6-acetate, a genotoxic compound.  Sucralose is known to cause and worsen diabetes and obesity, and increase the risk for cardiovascular diseases and cancer, among other harms.

147.     Defendant thus has violated, and continues to violate, § 349 of the New York General Business Law ("NYGBL"), which makes deceptive acts and practices unlawful.  As a direct and proximate result of Defendant's violations of § 349, Plaintiff Clay and other members of the New York Class have suffered damages in an amount to be determined at trial.

148.    Defendant's improper consumer-oriented conduct is misleading in a material way in that it, *inter alia*, induced Plaintiff Clay and the New York Class members to purchase and pay the requested price for the Products when they otherwise would not have, or would not have purchased as much.

149.    Defendant made the untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

150.    Plaintiff Clay and the New York Class members have been injured by their purchase of the Products, which were worth less than what they bargained and/or paid for, and which they selected over other products that may have been truthfully marketed.

151.    Defendant's advertising induced Plaintiff Clay and the New York Class members to buy the Products, to buy more of them, and/or to pay the price requested.

152.    As a direct and proximate result of Defendant's violations of § 349, Plaintiff Clay and the other members of the New York Class paid for falsely advertised Products and, as such, have suffered damages in an amount to be determined at trial.

153.    By reason of the foregoing, Plaintiff Clay and the New York Class members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 349(h).

## COUNT VI
### Violation of New York General Business Law § 350
### (On Behalf of Plaintiff Clay and the New York Class)

154.    Plaintiff Clay hereby incorporates the foregoing allegations as if fully stated herein.

155.    Each of the acts of Defendant, as described above, constitute unlawful, deceptive, and fraudulent business acts and practices.

156.     New York General Business Law § 350 declares unlawful any "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state[.]"

157.     NYGBL § 350-a defines "false advertising" in relevant part, as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

158.     Plaintiff Clay and the members of the New York Class are consumers who purchased Defendant's Products in New York.

159.     As a seller of goods to the consuming public, Defendant is engaged in the conduct of business, trade, or commerce, within the intended ambit of § 350.

160.     Defendant's representations (made by statement, word, design, device, sound, or any combination thereof), and also the extent to which Defendant's advertising has failed to reveal material facts with respect to its Products, as described above, have constituted false advertising in violation of § 350.

161.     Defendant knew, or reasonably should know, that its advertising of the Products is false. Defendant is the manufacturer, marketer, and seller of the Products and thereby is privy to the production, marketing, labeling, and production processes that create and put the Products into commerce. Defendant was in the best position to know of, and test for, the quality and safety of the Products but nonetheless chose to continue its course of marketing regardless.

162.     Defendant's actions led to direct, foreseeable, and proximate injury to Plaintiff Clay and the members of the New York Class.

163.     As a consequence of Defendant's deceptive marketing scheme, Plaintiff Clay and the other members of the New York Class suffered an ascertainable loss, insofar as they would not have purchased the Products had the truth been known, would not have paid the requested

price of the Products and/or would have purchased less of the Products; moreover, as a result of Defendant's conduct, Plaintiff Clay and the other members of the New York Class received the Products at a lesser value than what they paid for.

164.     By reason of the foregoing, Plaintiff Clay and the New York Class members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 350-e(3).

## COUNT VII
**Violation of the Massachusetts Unfair and Deceptive Business Practices Act**
**Massachusetts General Laws Chapter 93A *et seq.***
**(On Behalf of Plaintiff Genduso and the Massachusetts Class)**

165.     Plaintiff Genduso incorporates the foregoing allegations as if fully set forth herein.

166.     Plaintiff Genduso brings this claim individually and on behalf of the members of the Massachusetts Class against Defendant.

167.     Section 2 of Chapter 93 – the Massachusetts Unfair and Deceptive Business Practices Act ("MUDBPA") – prevents the use of "unfair or deceptive business acts or practices in the conduct of any trade or commerce."  An act is "deceptive" under Chapter 93A "if it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted."  *Tagliente v. Himmer*, 949 F.2d 1, 7 (1st Cir. 1991).

168.     It is "the intent of the legislature that in construing" whether an act is deceptive under 93A § 2, "the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended."  *See* Mass. Gen. Laws Ch. 93A, § 2.

169.    Section 9 provides: "Any person … who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two … may bring an action in the superior court … for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper. …  Any person entitled to bring such an action may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly situated persons."

170.    Pursuant to the definitions codified in Chapter 93A § 1, Defendant is a "person" and Defendant is engaged in "trade" and "commerce" in Massachusetts, because Defendant does business in Massachusetts and the acts and omissions alleged above and incorporated herein originated from Massachusetts.

171.    By engaging in the acts and omissions alleged above and incorporated herein, Defendant has engaged and continues to engage in unfair or deceptive acts or practices in the conduct of trade or commerce.

172.    Defendant's misrepresentations deceived, and have a tendency to deceive, a reasonable consumer and the general public.

173.    Defendant's acts and omissions are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

174.    Plaintiff Genduso and the Massachusetts Class reasonably relied upon, and were deceived by, Defendant's statements when they purchased the Products.

175.    Defendant knowingly misrepresented that the Products were safe at the time of sale and at all relevant times thereafter.

176.    Had Plaintiff Genduso known that the Products were not safe and healthier zero sugar beverages and powders and instead contain sucralose, which is known to cause a host of adverse health effects, she would not have purchased the Products.

177.    Defendant's misconduct caused Plaintiff Genduso and the Massachusetts Class Members to suffer an injury, adverse consequence, or loss because (a) they would not have purchased the Products on the same terms if the true facts were known about the Products; (b) they paid a price premium for the Products due to Defendant's promises that they are safe: and (c) the Products did not have the characteristics as promised by Defendant.

178.    Plaintiff Genduso and Members of the Massachusetts Class have been harmed by this injury, adverse consequence, or loss.

179.    The MUDBPA represents a fundamental public policy of the Commonwealth of Massachusetts.

180.    For each loss, Plaintiff Genduso and each Massachusetts Class Member may recover an award of actual damages or twenty-five dollars, whichever is greater.  Ch. 93A § 9(3).

181.    Because Defendant acted willfully or knowingly, Plaintiff Genduso and each Member of the Massachusetts Class may recover up to three but not less than two times this amount.  In addition, Plaintiff Genduso may recover attorneys' fees and costs.

182.    Plaintiff Genduso and the Members of the Massachusetts Class may also seek the imposition of injunctive relief, which limits and polices Defendant's representations within or reaching Massachusetts.  The balance of the equities favors the entry of permanent injunctive relief against Defendant.  Plaintiff Genduso, members of the Massachusetts Class, and the

general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff Genduso, Members of the Massachusetts Class, and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable of repetition or reoccurrence absent the entry of a permanent injunction.

183. In accordance with Massachusetts General Laws Chapter 93A, § 9(3) on or about May 19, 2025, prior to the filing of this Complaint, Defendant received from Plaintiff Genduso's counsel a pre-suit notice letter, apprising Defendant of its breach of warranties regarding the Products. The letter was sent via certified mail, return receipt requested. The letter stated that it was sent on behalf of Plaintiff Genduso and all other similarly situated purchasers. Defendant did not make any changes to the Products and did not pull the Products from the marketplace.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant as follows:

(i)     For an order certifying the respective Classes under Fed. R. Civ. P. 23, naming Plaintiffs as representatives of their respective Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(ii)    For an order declaring that Defendant's conduct violates the statutes referenced herein;

(iii)   For an order finding in favor of Plaintiffs and their respective Classes on all counts asserted herein;

(iv)    For compensatory, statutory, and punitive damages in the amounts to be determined by the Court and/or jury;

(v)     For prejudgment interest on all amounts awarded; and

(vi)    For an order awarding Plaintiffs and their respective Classes their reasonable attorneys' fees and expenses and costs of suit.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all claims so triable.

Dated:  9/23/2025

Respectfully submitted,

By: */s/ Carl V. Malmstrom*
Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
E-mail: malmstrom@whafh.com

Max S. Roberts
**BURSOR & FISHER, P.A.**
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiffs*